**MID–CAROLINA OIL, INC. and Happy Wildcat Oil Company, Plaintiffs,**

v.

**B. W. KLIPPEL, Jr. and Suzanne Mason Klippel, Defendants.**

Civ. A. No. 78–1481.

United States District Court,
D. South Carolina,
Columbia Division.

March 19, 1981.

David P. Cole, Iseman, Cole & Medlin, Columbia, S. C., for plaintiffs.

Jeter E. Rhodes, Jr., Stewart B. Hayes, Whaley, McCutchen, Blanton & Rhodes, Columbia, S. C., for defendants.

## ORDER

CHAPMAN, District Judge.

This matter is before the Court upon motion of the defendants for summary

judgment as to the federal claims stated in the first cause of action of the complaint and for dismissal of plaintiffs remaining pendent state claims. There is also a motion to dismiss the complaint as to the defendant Suzanne Mason Klippel for lack of jurisdiction as to her.

Several grounds for summary judgment have been extensively argued in briefs submitted by the parties. The primary question is the proper statute of limitations to be applied to the first cause of action in the complaint. This question is complicated by a conflict between this Court's opinion filed January 4, 1978 in Civil Action No. 78–749–9, *Wilkinson v. E. F. Hutton, et al*, and the decision of the Fourth Circuit Court of Appeals in *O'Hara v. Kovens*, 625 F.2d 15, decided July 16, 1980. In *Wilkinson* this Court found that the general South Carolina statute of limitations for fraud, which is six years as provided by § 15–3–530, South Carolina Code of Laws 1976, was applicable to a suit brought under the Securities and Exchange Commission Rule 10b–5. However, *O'Hara* rejected this position in a Maryland case and applied a one year statute of limitation under the Maryland Blue Sky Law, § 11–703. This Court finds that the Blue Sky laws of Maryland and South Carolina are so similar and Judge Haynsworth's opinion in *O'Hara* is so clear that it must be followed in the present case and the three year statute in the South Carolina Blue Sky Law, § 35–1–1530 must be applied.

The complaint alleges that plaintiff Mid–Carolina Oil, Inc. is a South Carolina corporation engaged in leasing and operating oil and gas fields and plaintiff, Happy Wildcat Oil Company, is a Missouri corporation, domesticated in the State of Kansas and engaged in the business of leasing and operating gas and oil fields.

The defendants are husband and wife and citizens and residents of the State of Missouri.

It is further alleged that in September 1972 Mr. Klippel was president of plaintiff Happy Wildcat and proposed to its Board of Directors that an offer be made to the plaintiff Mid-Carolina to purchase Mid-Carolina's interest in an oil and gas lease covering Buffalo Field located in Woodson and Wilson Counties, Kansas. The terms of the offer would exchange 2,000 shares of the common stock of Happy Wildcat to Mid-Carolina for assignment of the Buffalo Field lease. Later in the same month Mr. Klippel traveled to Columbia, South Carolina, met with representatives of Mid-Carolina and offered to purchase its interest in the Buffalo Field lease for 2,000 shares of Happy Wildcat common stock and other valuable consideration and represented to Mid-Carolina that it would then own 17% of the common stock of Happy Wildcat and would thereby retain a 17% interest in the Buffalo Field lease.

That in October 1972 Mr. Klippel mailed to Mid-Carolina an assignment of the Buffalo Field lease by which the lease would be assigned to Mr. and Mrs. Klippel, and by letter of explanation stated that the assignment was for the purpose of obtaining a bank loan for Happy Wildcat. The assignment was executed by Mid–Carolina and later in October 1972 Mr. Klippel obtained a loan from Home National Bank in Eureka, Kansas, in the amount of $20,000 and used the proceeds to purchase the interest of one Merton Jeanes in the Buffalo Field. At about the same time Mr. Klippel caused 2,000 shares of the common stock of Happy Wildcat to be issued in the name of and delivered to Mid-Carolina. This stock was previously authorized but unissued. However, on November 11, 1972, Mr. Klippel represented to the shareholders of Happy Wildcat that he had transferred 2,000 shares of Happy Wildcat common stock owned by him to Mid-Carolina and obtained a personal loan of $20,000 with which he and his wife purchased the Jeanes interest in the Buffalo Field leases.

It is further alleged that Mr. Klippel recommended to the shareholders of Happy Wildcat that they purchase the Buffalo Field leases from the defendants and that said shareholders agreed to do so, and thereafter Happy Wildcat assumed the $20,000 note to Home National Bank and repaid

the same with interest from corporate funds.

It is further alleged that at no time prior to June 28, 1976, did Mr. Klippel own as many as 2,000 shares of Happy Wildcat common stock, and that he has never returned any of his shares to Happy Wildcat, and despite the issuance by Happy Wildcat of 2,000 shares of its common stock to Mid-Carolina and the repayment by Happy Wildcat of the $20,000 note to Home National Bank, and repeated demands from plaintiffs that defendants transfer title in the Buffalo Field leases to Happy Wildcat, the defendants have refused to make such assignment and continue to operate the Buffalo Field and retain the profits therefrom.

Plaintiffs assert that the representations made by the defendants to the plaintiffs were materially false, known by Klippel to be materially false and made with the intention that the plaintiffs rely on such representation, that the plaintiffs were not aware that the representations were false and therefore relied upon the same and had the right to rely upon these representations, all to the plaintiffs' damage.

The complaint contains five causes of action, the first of which alleges manipulative, deceptive and fraudulent scheme under §§ 10 and 15 of the Securities Exchange Act of 1934, § 17 of the Securities Act of 1933 and Securities and Exchange Commission Rule 10b–5.

The second and fifth cause of action allege common law fraud. Cause of action three alleges breach of contract accompanied by a fraudulent act, and a second cause of action is for conversion of profits due plaintiff Happy Wildcat.

■ Section 15 of the Securities Exchange Act of 1934, 15 U.S.C. § 78o is not applicable to the present case because it covers brokers and dealers and the defendants are not alleged to be nor does any evidence indicate that they are brokers or dealers covered by the Securities Exchange Act.

The defendants contend that the alleged violations of § 10 of the Securities Act of 1934, Rule 10b–5 and under § 17 of the Securities Act of 1933 are all barred by the statute of limitations. Since federal securities laws have no statutes of limitations expressed therein, courts have adopted the practice of applying the statute of limitations of analogous state law. Defendants contend that the South Carolina Blue Sky Law, 35–1–1490 et seq., S.C. Code of Laws, 1976, is the analogous law and contains a three year limitation in § 35–1–1530. This section limits suits to a period of three years *after the contract of sale*, which in the present case would be October or November 1972. The present action was not filed until August 22, 1978.

In *Wilkinson, supra*, this Court found that § 35–1–1530 applied only to causes of action under §§ 35–1–1490 and 35–1–1500 and not to other sections of the South Carolina Blue Sky Law, particularly § 35–1–1210 which provides:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly to:

(1) employ any device, scheme or artifice to defraud;

(2) make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or

(3) engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person.

In *Wilkinson, supra*, this Court reasoned that actions under Rule 10b–5, were analogous to suits for fraud, since they required scienter, and should be governed by the state statute of limitations applicable to actions in fraud. This Court supported the *Wilkinson* decision with decisions from the Second, Ninth and Tenth Circuits and distinguished the Fourth Circuit decision in *Newman v. Prior*, 518 F.2d 97 (4th Cir. 1975). However, the Court cannot reconcile *Wilkinson* with *O'Hara*, the most recent statement by the Chief Judge of the circuit

on the question of the proper statute of limitations. A careful reading of *O'Hara* and a study of the Maryland Blue Sky Law persuades the Court that *O'Hara* is controlling.

Section 11–703 of the Maryland Corp. & Assn's Code Ann. creates the same offenses, causes of action and limitations as §§ 35–1–1490, 1500 and 1530 of the South Carolina Code.

Maryland Code § 11–301 is identical to South Carolina § 35–1–1210 and obviously patterned after Rule 10b–5. These sections having to do with a device, scheme or artifice to defraud contain no separate statute of limitations, but *O'Hara* conclusive holds that the limitation contained in Maryland § 11–703 controls actions brought under Federal Security laws.

Judge Haynsworth stated at page 18: When borrowing a state statute of limitations for federal purposes, a court should look to the statute which most clearly addresses the same or similar policy considerations as are addressed by the federal right being asserted. It is not necessary that the state statute operate in the same fashion as the federal scheme, nor is it necessary that the state statute describe a cause of action identical to the federal cause at issue. (citations omitted). There simply must be a commonality of purpose between the federal right and the state statutory scheme so that it is reasonable to subject the federal implied right to the statute of limitations provided by state law. By comparison, the shared purposes between section 10b and common law fraud are generalized at best. In *Fox v. Cane-Miller Corp.*, 542 F.2d 915, 918 (4th Cir. 1976), we held that the statute of limitations found in Maryland's blue sky law, Md. Corp. & Assn's Code Ann. section 11–703(f), would be applicable to implied actions arising under § 10(b). We see no reason to stray from that holding.

█ Following this reasoning the Court concludes that the three year statute of limitations in § 35–1–1530 is applicable. This statute begins to run from the date of the contract of sale, which in the present case would be sometime in October 1972. However, plaintiffs contend that the Court should apply the Federal Equitable Tolling Doctrine, since fraud is alleged, and this would prevent the action from being time barred under the plaintiffs' theory of the case.

Federal law has long held that where fraud is involved in an action, at law or in equity, the statute of limitation is tolled. *Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946).

In the District Court opinion in *O'Hara*, 473 F.Supp. 1161 (D.Md.1979) at page 1166, the Court quotes with approval the language from *Hupp v. Gray*, 500 F.2d 993, 996 (7th Cir. 1974) as follows:

the statute of limitations in a § 10(b) action may be tolled by the "equitable doctrine" of fraudulent concealment. In order to invoke this doctrine, however, the plaintiff must have remained ignorant of the fraud "without any fault or want of diligence or care on his part." *Bailey v. Glover*, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1871). It is well established that a plaintiff may not merely rely on his own unawareness of the facts or law to toll the statute. * * * The plaintiff, rather, has the burden of showing that he "exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud." * * * The statutory period "[does] not wait appellant's leisurely discovery of the full details of the alleged scheme."

Certainly, if Happy Wildcat could carry this burden for any length of time, it cannot do so after April 1973. At that time the directors of Happy Wildcat knew that Klippel and his wife owned the lease on the Buffalo Field. At a meeting of the directors in early April 1973 Klippel offered to sell the lease to Happy Wildcat, but the offer was not accepted because Happy Wildcat did not have any money with which to make the purchase or develop the field.

If Klippel had fraudulently concealed his activities from Happy Wildcat prior to

April 1973 by holding the Buffalo Field lease in his and his wife's name, such concealment ended with his offer to sell. At that point in time Happy Wildcat, through its directors, knew that it did not own the Buffalo lease which had been purchased from Mid-Carolina and that title to the lease had never been in Happy Wildcat. The statute of limitations as to Happy Wildcat, if the same was ever tolled by the alleged fraudulent concealment, did not continue to be tolled later than April 1973. Therefore, the action as to Happy Wildcat would be time barred when it was commenced in 1978.

As to Mid-Carolina the record is not as well documented, but there can be no doubt that Mid-Carolina was sufficiently on notice as to Klippel's activities so as to require Mid-Carolina to make a diligent and timely inquiry into the facts, which if made, would have revealed that Klippel had not assigned the Buffalo Field lease to Happy Wildcat.

Mid-Carolina was represented by a proxy at the meeting of Happy Wildcat when the question of the Klippels' offer to sell the lease to Happy Wildcat was discussed in April 1973. In addition Dr. John A. Watkins, a retired Army dentist, who had held the rank of Colonel, and is Mid-Carolina's largest stockholder, went to the oil fields in Kansas not later than October 1974 to meet with Klippel and find out why Mid-Carolina had not received any income from the project.

Dr. Watkins described himself as the official "trouble-shooter" for Mid-Carolina and was acting for its stockholders at the time. He still carries the title of trouble-shooter and is a director and former president of the corporation. In his deposition Dr. Watkins explains his reasons for going to Missouri and Kansas to meet with Mr. Klippel as follows:

Q. And you went there and met Mr. Klippel, but what was the purpose of your going there to meet him?

A. To try to find out what was going on. There was no money coming in. The shareholders wanted to know what was going on.

Q. Which shareholders at that time?

A. All of them.

Q. You are talking about Happy Wildcat and Mid-Carolina?

A. In 1974 was mostly, I would say Mid-Carolina in 1974.

It cannot be said that Watkins "exercised reasonable care and diligence in seeking to learn the facts which would disclose fraud."

Watkins had several meetings with Klippel and visited the oil fields with him. When asked about income from the field, he stated Klippel usually put him off and was evasive, which should have put any reasonable person on notice to check further. Although he was a large stockholder in Mid-Carolina and represented all of the stockholders at the time, Watkins made no effort to see the minute book or financial records of Happy Wildcat. He did not check ownership records in the courthouse to see if the lease had been assigned, or take any other steps to find out what was really going on.

Watkins asserts that Mid-Carolina and Happy Wildcat were not aware of Klippel's scheme to defraud them until his friend Giuseppe Tattatucci figured it out for him in 1977. According to Watkins Tattatucci played in an orchestra and has now probably died from malnutrition, since he ate mostly herbs and drank tea. Watkins cannot explain by what reasoning process Tattatucci came to the conclusion that Klippel was defrauding the plaintiffs. He testified Tattatucci had a very high I.Q. and after Watkins told him the facts about the transaction involving the plaintiffs and Klippel, Tattatucci concluded that the plaintiffs had been defrauded by Klippel.

At the time of the assignment of the lease from Mid-Carolina to Klippel and Happy Wildcat's refusal to buy the lease from Klippel, oil was selling for $2 per barrel. The appearance of OPEC and the ten-fold increase in the price of oil may have helped Tattatucci in his deduction, but it does not relieve Mid-Carolina of its burden to exercise reasonable care in 1973 and 1974 in investigating and seeking to learn

the true facts about its transaction with Klippel. Surely, the statute cannot wait upon Mid-Carolina's leisurely efforts or Tattatucci's revelations, and there was sufficient evidence available to Watkins in 1974 to reasonably apprise him of Klippel's alleged scheme not to transfer the lease to Happy Wildcat and to require him to diligently seek to learn the facts which would have disclosed the full extent of Klippel's actions which plaintiffs allege to be fraudulent.

Since, the theory of equitable estoppel could not toll the statute past October 1974, the three year statute would have run prior to commencing the suit in 1978, and the action of both Happy Wildcat and Mid-Carolina under § 10b–5 are time barred and must be dismissed. Since the plaintiffs' federal claims must be dismissed, the Court must also decline to hear their state claims. "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

In view of the above conclusions it is unnecessary to rule on Mrs. Klippel's motion to dismiss for lack of jurisdiction.

IT IS, THEREFORE, ORDERED that summary judgment be entered for the defendants as to the first cause of action and that the remaining causes of action be dismissed.

AND IT IS SO ORDERED.